IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KIMBERLY MYERS,         *

                              *

     Plaintiff,        *     Civil No. JFM 07-333

                              *

     v.               *

                              *

TGI FRIDAY'S, INC., *et al.*   *

                              *

     Defendant.        *

                             *****

# OPINION

Plaintiff Kimberly Myers has brought suit[1] against defendants TGI Friday's, Inc. ("Friday's") and Carlson Restaurants Worldwide, Inc. ("Carlson") jointly and severally as a result of an alleged slip and fall incident at Friday's.[2]  (Compl. ¶¶ 1-4.)  Myers alleges that Friday's was negligent in failing to adequately inspect and maintain the premises, and failing to warn her of and protect her from foreseeable dangers.  (*Id.* ¶ 5.)  As a result of the fall, Myers sustained injuries for which she seeks $250,000 in damages against defendant.  (*Id.* ¶¶ 6, 12.) Defendant has moved for summary judgment, and plaintiff's opposition and defendant's reply have followed.  For the reasons detailed below, I grant defendant's motion for summary judgment.

---

[1] Myers initially filed suit in the Circuit Court for Baltimore County, Maryland, Case No. 03-C-07-000327. (Notice of Removal ¶ 1.)  Under 28 U.S.C. §§ 1441 and 1446, the case was properly removed to this court on February 7, 2007, as this court has original jurisdiction over this action under 28 U.S.C. § 1332.  (Removal Notification Letter.)

[2] The parties stipulated and agreed on August 31, 2007 that all claims made by plaintiff against Carlson are dismissed with prejudice.  (Stipulation and Order of Dismissal.)

I.

The evidence on the summary judgment record is as follows.  At approximately 9:00 p.m.

on June 3, 2004, plaintiff met friends at Friday's restaurant in White Marsh, Maryland.  (Myers

Dep. at 20-21.)  Seated at the bar from about 9:00 p.m. until midnight, plaintiff had a "large

dinner" and "almost . . . three[,] . . . probably . . . about two and a half" alcoholic rum drinks.

(*Id.* at 24-27.)  At approximately 12:30 a.m., plaintiff walked from the bar area to the restrooms.

(Pl.'s Answers to Interrogatories, No. 1.)  To arrive at the restrooms, plaintiff had to walk to the

end of the bar, "where the kitchen entrance comes out," and pass over a "common floor" in front

of the kitchen.  (Myers Dep. at 28.)  Wearing "heeled shoes," (Pl.'s Opp. to Def.'s Mot. for

Summ. J. at 1), plaintiff "was caused to fall to the ground and sustain serious, painful and

permanent injuries primarily to her right elbow and right upper thigh as a result of her foot

coming into contact with [what plaintiff claims was] a wet, slippery and/or greasy substance

located on the floor near the restroom and kitchen areas of [Friday's]."  (Pl.'s Answers to

Interrogatories, No. 1.)  Specifically, plaintiff's right foot slipped out from under her, and she fell

on her right hip while trying to break her fall with her right arm.  (Myers Dep. at 30.)

Plaintiff did not see what caused her to fall or see any substance on the floor before or

after she fell, but she stated that "[t]he floor felt slippery."  (*Id.* at 31.)  Plaintiff did not see any

Friday's employee or any patron cause the floor to be slippery in the area in which plaintiff

slipped.  (*Id.* at 32.)  Following her fall, plaintiff stood up and went into the restroom for a few

minutes, where she was crying due to pain in her right arm and right hip.  (*Id.* at 30-31.)  After

leaving the restroom and returning to her seat, plaintiff spoke with a Friday's employee, who

asked plaintiff if she was "okay."  (*Id.* at 35.)  Plaintiff states that she did not speak with any

other Friday's employees or any other managers during the time she was at the restaurant, nor

did any Friday's employees or managers make any statements to plaintiff regarding her fall, offer

her treatment, or indicate that they were concerned about her fall or whether she had been

injured. (*Id.* at 36.)

      After speaking with the Friday's employee, plaintiff spoke for a few minutes with her

friends, who had not seen her fall.  (*Id.* at 32-33.)  Plaintiff told them that she "had slipped on the

wet floor."[3]  (Jessica Smith Dep. at 13.)  Still in pain, plaintiff left the bar and traveled about two

miles to meet with two friends who were paramedics to see if they thought her elbow "looked

dislocated."  (Myers Dep. at 33-34.)  They recommended that plaintiff go to the hospital.  (*Id.* at

34.)  Within ten minutes, plaintiff went to Franklin Square Hospital with a "really sharp pain in

my right arm" and swelling above her elbow.  (*Id.* at 41-42.)  After taking x-rays, the hospital

told plaintiff that "it was possibly a hairline fracture" and plaintiff had surgery on the evening of

June 4, 2004.  (*Id.* at 43-45.)  Plaintiff had another surgery in August 2004 and underwent

physical therapy.  (*Id.* at 47.)

      The two Friday's managers who were on duty on June 3-4, 2004 - Latisha Brown and

Bruce Savage - testified as follows.  On the night of plaintiff's fall, a server informed Savage,

who was in the "expo area"[4] outside the kitchen, that plaintiff had fallen.  (Savage Dep. at 13-

14.)  Savage did not see or hear plaintiff's fall.  (*Id.* at 14-15.)  Once plaintiff returned to her seat

---

[3] Plaintiff's friend, Jessica Smith, who was at Friday's with plaintiff the night of the fall, testified that on a subsequent visit to Friday's about six months later, she and friends - not including plaintiff - commented that in the area where plaintiff had fallen "the floors are kind of slick."  (Smith Dep. at 19.)

[4] This is "the area between the servers and the cooks, where the cooks put the food in the hot or cold window, and the person on expo expedites it, pulls it out, puts it on the counter, and it goes out to the table." (Savage Dep. at 14.)

from the restroom after the fall, Savage claims he asked plaintiff a few times whether she was okay and whether she needed medical help.  (*Id.* at 15.)  Plaintiff said she was fine and declined medical help.  (*Id.* 15-16.)  After hearing about plaintiff's fall from Savage, Brown (who also did not see the fall) claims she also approached plaintiff after plaintiff had returned from the bathroom to her bar seat.  (Brown Dep. at 22-23, 28.)  Brown identified herself as the manager on duty, asked about the incident, and "asked plaintiff if she was okay, if she wanted to fill out a report based on the incident."  (*Id.* at 28.)  Plaintiff declined to fill out a report and said she was okay.  (*Id.* at 28-29.)  Plaintiff did not say anything to Brown about what caused her fall.  (*Id.* at 31-32.)

Brown and Savage then "walked to [the area where plaintiff had fallen to] see if anything was wet on the floor, and then looked at the surrounding area to see if anybody had tracked anything from another spill to that area."  (Savage Dep. at 16.)  Brown testified that she inspected the area by bending down and using her hand to check the tile to "[c]heck[] to see if there was something that wasn't visible to the eye."  (Brown Dep. at 27.)  Brown "did not see anything out of the ordinary."  (*Id.* at 26-27.)  Savage also testified that he did not see anything. (Savage Dep. at 17.)  Contradicting Brown, however, Savage testified that neither of them got down close to the ground to inspect it with their hands but instead "[j]ust visually look[ed] down, bending down, looking, but not close to checking with our hands."  (*Id.*)  Brown and Savage filed an incident report the day after plaintiff's fall.  (*Id.* at 38; Brown Dep. at 38.)

Brown and Savage described the flooring where plaintiff fell as "a hard type tile," (Savage Dep. at 18; Brown Dep. at 20), and the area where plaintiff fell as "[w]ell lit."  (Brown Dep. at 26; Savage Dep. at 17-18 (describing the lighting as "fair lighting . . . [e]nough where

you could see where you was [sic] going").)  They explained that customers use the walkway

where plaintiff fell to get to and from the restroom, and Friday's employees use the same tile

area to get to and from the kitchen to deliver food to customers.  (Savage Dep. at 24-25; Brown

Dep. at 18-19.)  Savage testified that on a Thursday evening - the day of the week when plaintiff

was at Friday's - there are normally 14-17 servers working, and each server is normally

responsible for about four tables.  (Savage Dep. at 10-11.)  There were "quite a few" Friday's

employees that would have traveled over the tile floor where plaintiff fell on June 3-4, 2004 -

"the bartenders . . . come from the bar area, and they come and run their food.  The servers run

their food.  The host or hostesses come back to run food.  Managers run food.  And that's an all-

day occurrence from the day shift throughout the night shift."  (Savage Dep. at 39.)

      Brown and Savage testified that Friday's had a policy that all employees must wear

"black, non slip shoes."  (Brown Dep. at 52; Savage Dep. at 27.)  The purpose of these shoes is

"[j]ust so you wouldn't fall, you know, slip or fall on anything, any surfaces."  (Savage Dep. at

27.)  Savage conceded that one of the reasons employees are required to wear such shoes is, as

plaintiff's counsel put it, "because when you're in a restaurant, occasionally there's spills."  (*Id.*

at 28.)  More specifically, Savage agreed with plaintiff's counsel that "there's spills in

connection with servers loading their trays and taking them out to customers . . . And maybe a

bartender drops a glass or a customer drops a glass, and, you know, the restaurant is someplace

where spills occur."  (*Id.* at 29.)  Brown conceded that "grease from the grease fryers gets on the

floor in the kitchen" and that Brown "get[s] grease on [her] shoes walking through the kitchen."

(Brown Dep. at 62-63.)  Brown also admitted that customers arrive at Friday's for the purpose of

consuming alcohol, (*Id.* at 21), and that no policy prohibited customers from wearing any

particular type of shoe on the premises.  (*Id.* at 39.)  Moreover, the only place where a door mat is used inside the restaurant is in the entrance "foyer" where the "customers come in."  (*Id.* at 63-64.)

Friday's floors are generally cleaned daily by an overnight cleaning crew.  (*Id.* at 56-57; Savage Dep. at 41-42.)  The crew cleans the floors where the customers sit and the tile on the walkway between the restroom and the bar (where plaintiff fell) in the morning before Friday's opens.  (Brown Dep. at 56-57.)   The kitchen is cleaned from the "[n]ight into the morning." (*Id.*)  Friday's host and hostesses also go down the "restroom corridor . . . to check the restrooms every 15 to 20 minutes," specifically to "make sure the counters are wiped off, nothing's on the floor, the floors are swept, no toilet paper or paper towels are on the floor."  (Savage Dep. at 25.) In addition, Friday's employees "inspect the restaurant premises throughout the day during the course of their duties."  (Def.'s Answers to Interrogatories, No. 21.)  There was no other normal cleaning that took place unless "something unusual happens." (Brown Dep. at 56-57; Savage Dep. at 42.)

Whenever an employee is made aware of a spill, Friday's policy requires that employee to "identify the area, . . . mark it, and . . . get the spill cleaned immediately."  (Brown Dep. at 54.) Brown testified that the restaurant does "get . . . greasy spots on that tile area in front of the restroom in the kitchen area," and uses the same procedures as with spills.  (*Id.*)  If a customer slips and falls, Friday's employees are required to check the area.  (Savage Dep. at 38.)  If there were a spill, Friday's policy requires employees "to put Wet Floor signs out and then immediately get the spill up"; if there were no spill, a Friday's employee "would have to get an incident report and then get as much information on it as possible."  (*Id.*)

On the evening of plaintiff's fall, Savage did not see and was not aware of any spills in the restaurant prior to plaintiff's fall.  (Savage Dep. at 29.)  Brown similarly did not recall any spills or problems in any part of the restaurant on June 3-4, 2004.  (Brown Dep. at 53.)  Brown in particular remembered that plaintiff was wearing "shoes with a heel" because Brown heard the "the clicking sound that it made on the tile" when plaintiff exited the restaurant after her fall.[5] (Brown Dep. at 30.)  Brown also recalled that she learned from the bartender on duty on June 3-4, 2004 that plaintiff had been consuming alcohol.  (*Id.* at 32-33.)

## II.

A motion for summary judgment should be granted when the record establishes that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The substantive law of the cause of action determines which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The existence of other factual disputes between the litigants does not defeat an otherwise proper motion for summary judgment if none of the material facts are in dispute.  *Id.*  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*  In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be viewed in the light most favorable to the nonmoving party.  *Id.* at 255.

---

[5] The shoes plaintiff was wearing on June 3-4, 2004 were presented during plaintiff's deposition, but not marked as an exhibit.  (Myers Dep. at 28-30.)

Under Maryland law, a business proprietor owes a duty to his customers to exercise ordinary care to keep the premises in a reasonably safe condition.  *See Moulden v. Greenbelt Consumer Servs., Inc.,* 210 A.2d 724, 725 (Md. 1965).  However, the proprietor "is not an insurer of the safety of his customers while they are on the premises and no presumption of negligence on the part of the owner arises merely from a showing that an injury was sustained in his store."  *Id.; see also Giant Food, Inc. v. Mitchell*, 640 A.2d 1134, 1135 (Md. 1994).  To establish a *prima facie* case of negligence, the customer bears the burden of showing that the proprietor "created the dangerous condition or had actual or constructive knowledge of its existence."  *Lexington Mkt. Auth. v. Zappala*, 197 A.2d 147, 148 (Md. 1964); *Rawls v. Hochschild, Kohn & Co.*, 113 A.2d 405, 408 (Md. 1955); *Montgomery Ward & Co. v. Hairston*, 78 A.2d 190, 191 (Md. 1951).

Thus, a plaintiff must show first that there was a dangerous condition; if successful, the plaintiff must next prove that the defendant either caused or had knowledge of the condition.  To prove that the defendant caused the condition, the plaintiff must show how the condition was brought to the place where the plaintiff was injured.  *See, e.g.*, *Moulden* 210 A.2d at 726 (affirming directed verdict against plaintiff in part because it was "possible that another customer may have dropped [the string bean on which plaintiff slipped]"); *Rawls*, 113 A.2d at 410 (affirming judgment as a matter of law against plaintiff in part because "there was no evidence to indicate how [the water on which plaintiff slipped] had been brought there . . ."); *Montgomery Ward*, 78 A.2d at 191 (reversing the lower court in part because the oily spot on which plaintiff slipped "could have been caused by a customer tracking or dropping the substance immediately prior to the plaintiff's approach").

If the plaintiff is unable to show that the defendant caused the condition, the plaintiff must prove that the defendant had knowledge of the condition.  *Ronk v. Corner Kick, Inc.*, 850 F. Supp. 369, 371 (D. Md. 1994); *Montgomery Ward*, 78 A.2d at 191.  Although the customer does not have to prove that the defendant had actual knowledge of the condition, "the customer cannot recover unless it appears that the storekeeper could have discovered the condition by the exercise of ordinary care . . ." *Rawls*, 113 A.2d at 409.  Where the plaintiff alleges that the defendant had constructive notice of the condition, "[w]hether there has been sufficient time for a business proprietor to discover, cure, or clean up a dangerous condition depends on the circumstances surrounding the fall."  *Rehn v. Westfield Am., et al.*, 837 A.2d 981, 984 (Md. App. 2003); *see also Deering Woods Condo. Ass'n v. Spoon*, 833 A.2d 17, 24-25 (Md. 2003).

To prove that the defendant had constructive knowledge, the plaintiff must show how long the condition existed.  *See, e.g.*, *Moulden* 210 A.2d at 726 (affirming directed verdict against plaintiff in part because there was "no evidence as to how long [the string bean on which plaintiff slipped] had been on the floor"); *Rawls*, 113 A.2d at 409 (affirming judgment as a matter of law against plaintiff in part because "there was no evidence to indicate . . . how long [the water on which plaintiff slipped] had been there . . ."); *Ronk*, 850 F. Supp. at 371 (granting defendant's motion for summary judgment in part because "[p]laintiff cites no evidence as to how long the particular offending wet spot was on the floor, such that Defendants should have been on notice . . .").

A plaintiff's evidence is legally sufficient to warrant submission of a case to the jury if it "rises above speculation or conjecture, and so affords the rational basis needed for a determination that the defendant was guilty of negligence which produced the accident."

*Moulden*, 210 A.2d at 726.  A "mere surmise" that there may have been negligence is not sufficient to survive a summary judgment motion.  *Id.*

III.

Plaintiff alleges that Friday's was "negligent in that [it] failed to place any warning signs or otherwise cordon off the area where Plaintiff was caused to fall, [and] failed to make reasonable efforts to clean up and/or properly inspect, maintain, and/or supervise the activities taking pale in the area of [Friday's] where Plaintiff was caused to fall." (Pl.'s Answers to Interrogatories, No. 1.)  Plaintiff's claims cannot survive summary judgment, however, because plaintiff has not shown (1) that a dangerous condition existed, and even assuming a dangerous condition, (2) that Friday's created the dangerous condition that allegedly caused plaintiff's fall, or (3) that Friday's had actual or constructive knowledge of the dangerous condition.

(A)

Plaintiff provides little evidence supporting the existence of a dangerous condition. Plaintiff's only support for a dangerous condition is that the floor where plaintiff fell "felt slippery." (Myers' Dep. at 31.)  Plaintiff does not allege that her clothes or any other part of her person was wet or greasy following the fall.[6]  Furthermore, plaintiff concedes that she did not see what caused her to fall or see any substance on the floor before or after she fell.  (*Id.*)  No other witnesses, including the friends plaintiff was with on the evening of June 3-4, 2004, claim that the floor where plaintiff fell was slippery.  Only plaintiff's friend, Jessica Smith, testified that

---

[6] Although plaintiff has retained the shoes she was wearing the night of the fall, (Myers Dep. at 28-30), she does not argue that they provide evidence of wetness or grease.  (*See generally* Compl.; Myers Dep.; Pl.'s Opp. to Def.'s Mot. for Summ. J.)

during a *subsequent* visit about six months later did she her and friends comment that the floors in the area where plaintiff had fallen were "kind of slick." (Smith Dep. at 19.) In contrast, both Brown and Savage testified that after inspecting the floor, they "did not see anything out of the ordinary."[7] (Brown Dep. at 26-27; Savage Dep. at 17.) Plaintiff could just as well have slipped on the floor because of the heeled shoes she was wearing or from the effects of the almost three alcoholic drinks she had consumed. (*See* Pl.'s Opp. to Def.'s Mot. for Summ. J. at 1; Myers' Dep. at 26-27.)

Furthermore, in contrast to the instant case, the cases that plaintiff relies on for support found that a dangerous condition unquestionably existed. *See, e.g., Chalmers v. Great Atl. & Pac. Tea Co.*, 192 A. at 419, 420 (Md. 1937) (plaintiff fell over a carton box in the passage way of defendant's grocery store); *Diffendal v. Kash and Karry Serv. Corp.*, 536 A.2d 1175, 1176 (Md. App. 1988) (plaintiff fell over an "L-bed" cart in the frozen food aisle of defendant's supermarket); *Tennant v. Shoppers Food Warehouse Md. Corp.*, 693 A.2d 370, 372 (Md. App. 1997) (plaintiff slipped on leaves and fell over an empty box in front of the cabbage display in defendant's store); *O'Neill & Co. v. Crummit*, 190 A. 763, 764-65 (Md. 1937) (plaintiff slipped on a greasy substance while alighting from defendant's negligently operated elevator).

For purposes of a summary judgment motion, however, viewing the facts in the light most favorable to plaintiff, I will assume that a dangerous condition did exist as plaintiff alleges. *See Montgomery Ward*, 78 A.2d at 191 ("For the purpose of the demurrer prayer we must

---

[7] That Brown and Savage contradict each other regarding whether they got close enough to the floor to inspect it with their hands following plaintiff's fall, (*see* Brown Dep. at 27; Savage Dep. at 17), does not present a genuine issue of material fact because neither testified that there was a dangerous condition. Furthermore, it does not present a dispute of material fact as to Friday's notice of the dangerous condition because Brown's and Savage's testimony is as to their *subsequent* inspection of the area.

assume the truth of the plaintiff's testimony that she slipped on an oily spot at the foot of the

stairs," although no other evidence of an oily spot was found).

(B)

Even assuming that the floor was slippery, plaintiff has not presented sufficient evidence

that defendant caused or had knowledge of the dangerous condition.  Plaintiff argues that a

reasonable jury could conclude from deposition testimony that Friday's employees caused the

condition by transferring water or grease from the kitchen floor to the tile where plaintiff fell.

(Pl.'s Opp. to Def.'s Mot. for Summ. J. at 6.)  In particular, plaintiff emphasizes that she stated in

her deposition that the floor in front of the kitchen "felt slippery" and later told her friend,

Jessica Smith, that she slipped on "the wet floor."  (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 6;

Myers' Dep. at 31; Smith's Dep. at 13.)  Furthermore, plaintiff points to Smith's testimony that

Smith observed slippery conditions on the same floor on a subsequent visit six months later, and

that Brown conceded that grease spots had appeared in the same spot prior to plaintiff's fall.

(Pl.'s Opp. to Def.'s Mot. for Summ. J. at 6; Smith Dep. at 19; Brown Dep. at 54.)  Brown

further admitted that grease from the kitchen equipment gets on the floor in the kitchen, and had

transferred before to her shoes.  (Brown Dep. at 62-63.)  Finally, plaintiff points out that 14-17

servers typically work on a Thursday night at Friday's, and that "quite a few" employees go to

and from the kitchen over the area where plaintiff fell.  (*See* Pl.'s Opp. to Def.'s Mot. for Summ.

J. at 6; Savage Dep. at 10–11, 39.)

This evidence amounts to no more than mere speculation or conjecture, however.  As

plaintiff concedes, the area where plaintiff fell was shared by employees exiting the kitchen and

customers traveling to the restrooms.  (*See* Pl.'s Opp. to Def.'s Mot. for Summ. J. at 3, 7; Savage

-12-

Dep. at 24-25; Brown Dep. at 18-19.)  Plaintiff also concedes that she did not see what caused her to fall or how it arrived there.  (Myers' Dep. at 31.)  Brown's admission that she has seen grease spots in the same area before plaintiff's fall and Smith's testimony that the floor was slippery six months later does not make it any more likely that those conditions were caused by Friday's employees rather than customers.  The fact that kitchen grease has gotten on Brown's shoes before and that employees often walk over the area is similarly unpersuasive.  Plaintiff has alleged that she slipped on "a wet, slippery and/or greasy substance", (Pl.'s Answers to Interrogatories, No. 1), not specifically a greasy substance that most likely would have come from the kitchen.  A customer could just as easily have tracked water from the bathroom or spilled a drink on the floor in that area.  Furthermore, there is no evidence that customers walk over the area to get to the restrooms less frequently than employees walk over the area to get to the kitchen.

Similarly in *Ronk*, the court held that plaintiff had not provided sufficient evidence that the wet spot on which plaintiff slipped in the corner of the defendant's racquetball court was caused by the defendant's negligent maintenance of the HVAC system.  850 F. Supp. at 370-71.  The court explained: "No witness is able to say, for instance, that he saw the water emanating from the heating or cooling vent . . . [O]n the day in January, 1990 when Plaintiff fell, the wet spot might as easily have come from a hole in the roof, water or ice tracked in by earlier players, or the contents of a thermos jug inadvertently spilled on the floor." *Id.*  The court concluded: "Where the presence of a foreign substance on a floor is explainable by causes beyond a proprietor's control as well as within it, it is impermissible for a trier of fact to conclude that the proprietor's cause was the cause-in-fact." *Id.; see also Zappala*, 197 A.2d at 148 (no liability for

grease spot on floor of parking lot, which may have leaked moments before from another customer's car); *Montgomery Ward*, 78 A.2d at 191 (no liability because the oily spot on which plaintiff slipped "could have been caused by a customer tracking or dropping the substance immediately prior to the plaintiff's approach"); *Moulden*, 210 A.2d at 726 (no liability for string bean on grocery store floor where "[t]he bean may have fallen from [another customer's] grocery cart a few moments before [plaintiff] walked up the aisle"); *Rawls,* 113 A.2d at 410 (no liability for water spot because it could have come from another customer in the store).

Accordingly, in the instant case, because it is equally likely that a customer caused Friday's floor to be slippery, no reasonable juror could find by a preponderance of the evidence that a Friday's employee created the dangerous condition.

### (C)

Plaintiff's argument that defendant had actual or constructive knowledge of the slippery floor also fails a motion for summary judgment.  Plaintiff does not allege that Friday's had actual notice of the slippery floor, (*see generally* Compl.; Myers Dep.; Pl.'s Opp. to Def.'s Mot. for Summ. J.), nor is there any evidence of actual notice.  Instead, alleging constructive notice, plaintiff argues that Friday's should have anticipated the risk that customers might slip on wet or greasy substances.  (Pl.'s Opp. to Def.'s Mot. for Summ. J. at 9.)  Plaintiff contends that by placing mats in the front of the restaurant and requiring its employees to wear non-slip shoes, (Brown Dep. at 52, 63–64; Savage Dep. at 27-28), Friday's "knew of the danger posed by wet and greasy substances on its floors and should have anticipated the risk [plaintiff] was exposed to."  (*Id.*)  Furthermore, plaintiff argues that in permitting customers to enter Friday's without non-slip shoes and to drink alcohol, (Brown Dep. at 21, 39), Friday's must have intended for

them "to be able to use the passageway in front of the kitchen to access the bathroom." (*Id.*)

Thus, plaintiff asserts, a reasonable juror could find that Friday's "failed to exercise due care in

not detecting and correcting an anticipated condition." (*See* Pl.'s Opp. to Def.'s Mot. for Summ.

J. at 9.)

In support of this argument, plaintiff cites a line of slip and fall cases in which Maryland

appellate courts held that the plaintiff deserved to have his case go to the jury. (*See* Pl.'s Opp. to

Def.'s Mot. for Summ. J. at 5-9 (citing *Chalmers*, 192 A. at 422; *Diffendal*, 536 A.2d at 1178;

*Tennant*, 693 A.2d at 375; *O'Neill*, 190 A. at 767; *Mondawmin Corp. v. Kres*, 266 A.2d 8 (Md.

1970).) As detailed below, these cases are clearly distinguishable from the instant case because

the court in each concluded that the defendant had clearly *caused* the dangerous condition from

which the plaintiff's injury resulted.

In *Chalmers*, *Diffendal*, and *Tennant*, the courts relied upon two facts distinct from the

instant case in deciding for the plaintiffs: the defendants had clearly created the dangerous

condition, and the incidents took place in grocery stores, where the defendants intended that

customers look at the goods displayed, not watch for dangerous conditions in the aisles. In each

of these cases, the plaintiff fell over a box or cart that the defendant's employees had placed in

the grocery store aisle. *Chalmers*, 192 A. At 420; *Diffendal*, 536 A.2d at 1176; *Tennant*, 693

A.2d at 372. *Chalmers* held that it could not say as a matter of law "that the conduct of the

defendant in placing the carton over which the plaintiff fell in the only passageway provided for

access to the meat counter, or in permitting it to remain there, afforded no negligence."

*Chalmers*, 192 A. at 421. *Chalmers* explained that the storekeeper must show greater vigilance

in avoiding placing obstacles in the aisles because he "expects and intends that his customers

-15-

shall look not at the floor but at the goods which he displays to attract their attention and which he hopes they will buy." *Id.* at 422; *see also Diffendal* (emphasizing that ". . . the fact that the possessor of the premises has eyecatching objects on display which divert the visitor's attention is an important factor for consideration" (quoting *Borsa v. Great Atlantic and Pacific Tea Co.*, 215 A.2d 289, 292-93 (Pa. Super. 1965))); *Tennant*, 693 A.2d at 376 ("where the occupier . . . should anticipate an unreasonable risk of harm to the invitee . . . [e.g., "where there is reason to expect that the invitee's attention will be distracted, as by goods on display",] something more in the way of precautions may be required" (citing W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 61, at 427 (5th ed. 1984) (footnotes omitted))).

Plaintiff's reliance on these three cases is misplaced because there is no evidence in the instant case that Friday's created the dangerous condition, *see supra* Part III(B), and the greater precautions necessary in the "grocery store scenario" do not apply to the instant case.  Therefore, plaintiff's argument that Friday's should have anticipated the risk of plaintiff's fall because it "intended" for its customers to use the "passageway" to the restrooms is unpersuasive.[8]  (*See* Pl.'s Opp. to Def.'s Mot. for Summ. J. at 9.)  *Tennant* explained further why *Chalmers* and *Diffendal* do not apply to the instant case.  While in *Chalmers* and *Diffendal* the dangerous condition was created by the defendant, in *Moulden* and *Zappala* - like in the instant case - "the plaintiff claim[ed] that the defendant ha[d] breached its duty to inspect for dangers created by third parties, including other invitees."  *Tennant*, 693 A.2d at 377.  *Moulden* and *Zappala* did not

---

[8] That Friday's requires its employees to wear non-slip shoes, permits customers to wear any type of footwear, and has a mat only at the restaurant entrance is nothing more than sensible business policy; it has no bearing on whether Friday had constructive knowledge of the allegedly slippery floor on which plaintiff fell on the night of June 3-4, 2004.

apply to *Tennant* because constructive notice was not an issue in *Tennant*: the defendant's

employees had knowingly placed the box over which the plaintiff tripped in the aisle.[9]  *Id.*

Where constructive notice is the issue - such as in the instant case - *Tennant* held:

> We do not suggest, however, that an owner is always deemed on notice with respect to any act of its employee.  If a store employee were, for example, *unwittingly* to drop some grapes on the floor, causing a hazard to a shopper, *Moulden* may well control.  In that situation, it would not necessarily matter whether it was another customer or an employee who had *unknowingly* dropped the fruit.  When an employee or another invitee unknowingly creates a dangerous condition the focus may shift to the owner's duty to inspect.

*Id.* (emphasis in original).

Accordingly, the focus in the instant case must be on whether a jury could find that

Friday's did not reasonably inspect the premises.  Plaintiff attacks Friday's inspection and

cleaning policies, emphasizing that Friday's policy required only that an employee pass through

the area every 15-20 minutes "for the sole purpose of assessing the condition of the restrooms."

(Pl.'s Opp. to Def.'s Mot. for Summ. J. at 8.)  Plaintiff also cites Friday's "vague[] assert[ion]"

that its employees inspect the restaurant "throughout the day during the course of their duties",

---

[9] Similarly, the evidence in *O'Neill* strongly supported the conclusion that the defendant had created the dangerous condition.  *O'Neill* affirmed a jury verdict against the defendant department store where a customer slipped on a greasy substance while alighting from defendant's negligently operated elevator.  190 A. at 766-67.  The court held that "the carrier cannot discharge its duty to the passenger by causing the elevator to drop, thereby throwing her to the floor, while she is leaving it by implied invitation of the operator."  *Id.* at 767.  In distinguishing *O'Neill,* the Court of Appeals of Maryland in *Montgomery Ward*, 78 A.2d at 191, and *Lusby v. Baltimore Transit Co.*, 72 A.2d 754, 756 (Md. 1950), focused on the fact that the defendant in *O'Neill* had clearly not provided its customers a safe exit from the elevator.  *Lusby* stated that "the testimony of the plaintiff [in *O'Neill*] indicated clearly that there was so much grease on the floor and it was so dark, that it could not be seen by [plaintiff], and that it was in the exact place where she was supposed to step from the elevator."  *Lusby*, 72 A.2d at 756; *see also Mondawmin Corp.*, 266 A.2d at 10-14 (upholding a jury verdict for plaintiff where the defendant's fountain clearly caused the wet steps resulting in the plaintiff's fall, wetness which the defendant clearly should have anticipated).  Because there is no evidence that Friday's created the dangerous condition, *O'Neill* and *Mondawmin Corp.* are distinguishable.

(*Id.*; Def.'s Answers to Interrogatories, No. 21), and that the area is only cleaned once a day at

night or in the morning before Friday's opens.  (Brown Dep. at 56-57.)  Plaintiff concludes that

whether these policies constitute reasonable care is a question properly reserved for the jury.

(*Id.*)

Maryland law, however, makes clear that the issue of Friday's constructive notice should

be decided against plaintiff as a matter of law.  To begin, plaintiff fails to show how long the

floor was slippery, which is required to prove that Friday's had constructive knowledge of the

condition.  *See Moulden*, 210 A.2d at 726; *Rawls*, 113 A.2d at 409; *Ronk*, 850 F. Supp. at 371.  In

*Moulden,* the court affirmed a directed verdict for the defendant supermarket because there was

no evidence of actual or constructive notice of a dangerous condition.  The court held:

> There being no evidence as to how long the bean had been on the floor, and it being
> possible that another customer may have dropped it just before appellant stepped on it,
> any finding by a jury that the employees of the store saw the bean or should have seen it
> in time to remove it or warn appellant, would rest on pure conjecture and not on
> reasonable inference.

*Moulden*, 210 A.2d at 726 (quoting *Orum v. Safeway Stores, Inc.,* 138 A.2d 665, 666 (D.C. App.

1958)).

Similarly, in *Montgomery Ward* and *Zappala,* the Court of Appeals of Maryland

emphasized that the dangerous condition could have been caused by another customer

*immediately prior* to the plaintiff's slip and fall; thus, the plaintiff could not prove how long the

condition had existed.  *Montgomery Ward*, 78 A.2d at 191; *Zappala*, 197 A.2d at 148.  In *Ronk*,

the court held that there was no constructive notice because plaintiff cited no evidence as to how

long the "particular offending wet spot" was on the racquetball court.  *Ronk*, 850 F. Supp. at 371.

Because the plaintiffs in these cases could not show how long the condition had existed, there was no constructive notice as a matter of law.

In the instant case, the wet or greasy substance that plaintiff alleges was on Friday's floor similarly could have arisen only moments before plaintiff's fall.  Plaintiff does not allege or provide any evidence as to how long the floor was slippery before she fell.  Instead, plaintiff relies on Brown's testimony that the floor had been greasy on prior occasions, (Brown Dep. at 54), and Smith's testimony that it looked slippery on a subsequent occasions.  (Smith Dep. at 19.)  This evidence is too speculative and remote to support an argument that Friday's employees should have been on notice of or anticipated a slippery floor at 12:30 a.m. on June 4, 2004.[10]

Furthermore, Friday's inspection and cleaning policies do not allow for the inference that Friday's could have discovered the condition by the exercise of reasonable care.  *See Rawls*, 113 A.2d at 410.  In *Montgomery Ward*, the defendant had cleaned the store after closing the previous night and had mopped it with a dry mop the morning of the accident, which took place at 12:30 p.m.  *Montgomery Ward*, 78 A.2d at 190.  In *Moulden*, the manager had examined the aisle about two and half hours before plaintiff slipped.  *Moulden*, 210 A.2d at 725.  In the instant case, Friday's employees not only cleaned the floors every morning and inspected the floor throughout the day, but also walked over the floor area where plaintiff fell every 15-20 minutes to assess the condition of the restrooms.  Regardless of whether Friday's employees walked over the area every 15-20 minutes for the "sole purpose" of checking the bathrooms, (Pl.'s Opp. to

---

[10] Similarly, the *Ronk* court found plaintiff's evidence that two individuals observed moisture on the walls and floor of the racquetball court on 5-7 occasions over approximately a three-year period prior to the accident insufficient.  These observed incidents "are too few and far between, as well as too remote in time, to have put Defendants on constructive notice as of January, 1990 when Plaintiff fell."  *Ronk*, 850 F. Supp. at 371.

Def.'s Mot. for Summ. J. at 8), their trip over the area would nonetheless have made them aware of any wetness or greasiness on the floor.  Maryland courts have held that it would be unreasonable to impose a duty on occupiers to continuously inspect their premises.  *See Moulden*, 210 A.2d at 726; *Zappala*, 197 A.2d at 148.  I decline to impose one here.

Because no reasonable jury could find that defendant created the dangerous condition or had actual or constructive notice of its existence, defendant's motion for summary judgment is granted.  A separate order to that effect is being entered herewith.

Date:  <u>November 9, 2007</u>                    /s/_____

                                                       J. Frederick Motz
                                                       United States District Judge